UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
VICTOR GUZMAN,

|  |  |
|---|---|
| Plaintiffs, | 11 Civ. 5834 (JPO)(FM) |
| -against- | **MEMORANDUM OF LAW** |

UNITED STATES OF AMERICA, THE CITY OF
NEW YORK, Investigator JASON ROBLES, DEA
Special Agent JOSEPH MERCURIO, NYPD Sergeant
CORNELIUS P. CLANCY, DEA Special Agent
MICHAEL REVERENDO, State Police Special
Investigator MICHAEL BRYANT, Detective KEVIN
ROY, and State Police Investigator BRUCE TAYLOR,

Defendants.
-------------------------------------------------------------------X

**PLAINTIFF, VICTOR GUZMAN'S MEMORANDUM OF LAW IN
OPPOSITION TO THE DEFENDANTS' MOTIONS TO DISMISS
PURSUANT TO RULE 12(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

CHRISTOPHER M. NYBERG (CN8937)
The Jacob D. Fuchsberg Law Firm, LLP
Attorneys for Plaintiff VICTOR GUZMAN
500 Fifth Avenue, 45th Floor
New York, NY 10110
Tel: (212) 869-3500
Fax: (212) 398-1532
c.nyberg@fuchsberg.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ iv

PRELIMINARY STATEMENT .................................................... 1

EXHIBITS ............................................................................ 5

STATEMENT OF FACTS ........................................................ 5

ARGUMENT ........................................................................ 10

I.   STANDARD FOR DISMISSAL ON A RULE 12(B)(6) MOTION TO DISMISS ... 10

II.  THE PLAINTIFF HAS PROPERLY PLED HIS CLAIM OF FALSE ....... 12
     ARREST/IMPRISONMENT AGAINST THE DEFENDANTS

     A.  *Plaintiff Has Properly Pled the First Element of False Arrest* ........ 13

     B.  *Plaintiff Has Properly Pled the Second and Third Elements of False Arrest* ... 14

     C.  *Plaintiff Has Properly Pled and Shown the Fourth Element of False Arrest* ... 15
         *that it was not "Otherwise Privileged" as There Was No Probable Cause*
         *and as the Plaintiff Did Not Own, Know About, or Possess the Narcotics*
         *Found in the Subject Premises*

         1.  *Plaintiff Has Properly Pled That the False Arrest of Guzman* ....... 15
             *Was Not "Otherwise Privileged"*

         2.  *There Was No Probable Cause for Victor Guzman's Arrest/* ......... 16
             *Imprisonment in the Three Hours Before His Formal Arrest*

         3.  *There Was No Probable Cause for Victor Guzman's Arrest* ........ 18
             */Imprisonment in the Three Hours Before His Formal Arrest*

III. THE PLAINTIFF HAS PROPERLY PLED HIS MALICIOUS PROSEUCTION ... 20
     CLAIMS AGAINST THE DEFENDANTS

     A.  *Plaintiff Properly Pled That the Defendants Had Actual Malice* ...... 20

     B.  *Plaintiff Properly Pled Termination in the Plaintiff's Favor* ......... 22

     C.  *Plaintiff Properly Pled The Lack of Probable Cause For the Prosecution* ... 24
         *of Guzman*

IV.  THE PLAINTIFF HAS PROPERLY PLED CLAIMS OF ILLEGAL SEARCH ... 24

AND SEIZURE AND VIOLATIONS OF *MIRANDA* UNDER §1983/BIVENS V. SIX UNKNOWN

V. PLAINTIFF HAS PLED A VALID CLAIM AGAINST THE CITY OF NEW          25
YORK UNDER STATE LAW AND UNDER §1983/*MONELL* MUNICIPAL
LIABILITY

    *A.  The City is Liable Under State Law Through Respondeat Superior*          25

    *B.  The City is Liable Under §1983, Pursuant to Monell Municipal Liability*          28

CONCLUSION          30

## TABLE OF AUTHORITIES

**Cases**                                                                      **Pages**

Ashcroft v. Iqbal.
556 U.S. 662 (2009)...............................................................11, 12

Batista v. Rodriguez,
702 F.2d 393 (2d Cir. 1983)...............................................................28

Bell Atlantic v. Twombly,
550 U.S. 544 (2007)...............................................................11, 21

Beauchamp v. City of New York,
3 A.D.3d 465 (2d Dep't 2004)...............................................................26

Bernard v. United States,
25 F.3d 98 (2d Cir. 1994)...............................................................12

Bowen v. City of New York,
2010 WL 5122590 (S.D.N.Y. 2010)...............................................................28

Brandon v. City of New York,
705 F. Supp 2d 261 (S.D.N.Y. 2010)...............................................................25, 28

Brogdon v. City of New Rochelle,
200 F.Supp.2d 411 (S.D.N.Y. 2002)...............................................................21

Chambers v. Time Warner, Inc.,
282 F.3d 147 (2d Cir. 2002)...............................................................11

Coakley v. Jaffe,
49 F. Supp. 2d 615 (S.D.N.Y. 1999)...............................................................23

Conley v. Gibson,
355 U.S. 41 (1957)...............................................................11

Conkey v. State,
74 A.D.2d 998 (4th Dep't 1980)...............................................................21

Faraq v. United States,
597 F. Supp.2d 436 (E.D.N.Y. 2009)...............................................................27

Gonzalez v. City of Schenectady,
2001 WL 1217224 (N.D.N.Y. 2001)...............................................................17

**Cases**                                                                    **Pages**

Grandon v. Merill Lynch,
    147 F.3d 184 (2d Cir. 1988)...........................................................11

Hankins v. Great Atl. & Pac. Tea Co.,
    208 A.D.2d 111 (1st Dep't 2005)....................................................23

Hayes v. Perotta,
    751 F. Supp. 2d 597 (S.D.N.Y. 2010)........................................17, 25

Holland v. City of Poughkeepsie,
    90 A.D.3d 841 (2d Dep't 2011)...............................................15, 20

Hygh v. Jacobs,
    961 F.2d 359 (2d Cir. 1992)........................................................ 22

Jenkins v. City of New York,
    478 F.3d 76 (2d Cir. 2007).....................................................13, 14

Jocks v. Tavernier,
    316 F.3d 128 (2d Cir. 2003)...................................................20, 24

Loria v. Gorman,
    306 F.3d 1271 (2d Cir. 2000).......................................................25

Lowth v. Town of Cheektowaga,
    82 F.3d 563 (2d Cir. 1996).........................................................21

Madonna v. United States,
    878 F.2d 62 (2d Cir. 1989)....................................................10, 16

Maldonado v. Pharo,
    940 F. Supp. 51 (S.D.N.Y. 1996)..................................................12

Martinez v. Simonetti,
    202 F.3d 625 (2d Cir. 2000)........................................................15

McDermott v. City of New York,
    2002 WL 265127 (S.D.N.Y. 2002)................................................25

Monell v. Dep't of Social Servs.,
    436 U.S. 658 (1978)...............................................................27

Murphy v. Lynn,
    118 F.3d 938 (2d Cir. 1997).......................................................22

**Cases**                                                                 **Pages**

Nardelli v. Stamberg,
    44 N.Y.2d 500 (1978)..................................................................21

Oklahoma v. Tuttle,
    471 U.S. 808 (1985)..............................................................29, 30

Raysor v. Port Authority,
    768 F.2d 34 (2d Cir. 1985)....................................................17, 18

Riverway Realty, Inc. v. City of Niagara Falls,
    754 F.2d 49 (2d Cir. 1985).........................................................11

Riviello v. Waldon,
    47 N.Y.2d 297 (1979)..............................................................26

Ryan v. N.Y. Tel. Co.,
    62 N.Y.2d 494 (1984)..............................................................23

Savino v. City of New York,
    331 F.3d 63 (2d Cir. 2003)....................................................15, 16

Stern v. Trustees of Columbia Univ.,
    131 F.3d 305 (2d Cir. 1997)......................................................20

Tsachalis v. City of Mount Vernon,
    293 A.D.2d 525 (2d Dep't 2002)..................................................15

United States v. Gordils,
    982 F.2d 65 (2d Cir. 1992)........................................................18

United States v. Guzman,
    724 F. Supp. 2d 434 (S.D.N.Y. 2010)............1, 11, 14, 16, 18, 20, 24, 25

United States v. Pelusio,
    725 F.2d 161 (2d Cir. 1983)......................................................18

United States v. Rodriguez,
    392 F.3d 539 (2d Cir. 2004)....................................................18, 19

United States v. Samaria,
    239 F.3d 228 (2d Cir. 2001)......................................................19

Wallace v. Kato,
    549 U.S. 384 (2007)...............................................................13

**Cases**                                                                                              **Pages**

Weyant v. Okst,
     101 F.3d 845 (2d Cir. 1996)…………………………………………………………..13

**Statutes**                                                                                           **Pages**

21 U.S.C. §878(b)…………………………………………………………………………….26

5 U.S.C. §3374(c)………………………………………………………………………….4, 26

Victor Guzman ("Guzman"), through his counsel, submits this Memorandum of Law in opposition to the Motions to Dismiss of defendants United States of America, Jason Robles, Joseph Mercurio, Cornelius P. Clancy, Michael Reverendo, Michael Bryant, Kevin Roy, and Bruce Taylor (together the "Federal Defendants") and The City of New York (the "City").

## PRELIMINARY STATEMENT

This is the case of Guzman, an innocent man who had his state and constitutional rights completely violated by the Defendants, which is demonstrated by the testimony at the suppression hearing in Guzman's criminal case and in the Honorable Judge Lewis A. Kaplan's decision, United States v. Guzman, 724 F. Supp. 2d 434 (S.D.N.Y. 2010), attached as Exhibit H.

On April 29, 2009, the defendants approached the apartment where Guzman resided without any probable cause that he had committed a crime. Immediately upon entering, they conducted an impermissible warrantless sweep, and began a 2-3 hour interrogation and search of the Subject Premises. During this time, the defendants restrained and limited Guzman's movement, effectively arresting and imprisoning him. They coerced and threatened Guzman with arrest, violence, the arrest of his family, his deportation, and taking his children away. As a result of this coercion, the defendants got Guzman to consent to the search, and eventually to sign off on a statement that he owned the drugs that were found in a hidden compartment of a room that was formerly occupied by another tenant. Such statement was obtained under duress and using threats, even after Guzman exercised his *Miranda* rights that he did not wish to speak to the police. After Guzman was formally arrested following his signing of the "statement", he was imprisoned for over 1.5 years, **for possession of narcotics that he did not possess and knew nothing about** (see Affidavit, Exhibit C), until the filing of a Nolle Prosequi on November 4, 2010, which was filed as there was absolutely no evidence with which to convict Guzman.

1

The Defendants' Motions to Dismiss should be denied as Plaintiff has pled significant factual allegations in paragraphs 46-154 of Plaintiff's Second Amended Complaint (Exhibit A), and additional allegations within each cause of action, which allege how the facts of the case fit within all of the elements of each cause of action. These allegations are sufficient to make Plaintiff's claims plausible, especially as all such facts are presumed to be true, and as Plaintiff is entitled to have all reasonable inferences drawn in his favor. See infra Section I.

Plaintiff properly pled the elements of False Arrest/False Imprisonment ("False Arrest") (Exhibit A, ¶¶155-216), that the defendants intentionally confined Guzman, that Guzman was aware of his confinement, and that Guzman did not consent to this confinement in both the 2-3 hours before his formal arrest and afterwards. See infra Section II. Plaintiff also properly pled the fourth element that the False Arrest was not "otherwise privileged" in that there was no probable cause for Guzman's imprisonment both before and after his formal arrest. See infra Section II.C.

The defendants bear the burden of proving that probable cause existed, and such question is usually for the jury. In this case, there was no probable cause to imprison Guzman in the 2-3 hours before his formal arrest, which Robles admitted (Exhibit C, p. 51), and the Federal Defendants do not even seek to dismiss the False Arrest claim for the period before the discovery of narcotics (the City does not even acknowledge the distinction between the two periods), as they admit it "may require factual development." (see Federal Defendants' Memorandum, p. 15). See infra Section II.C.2. Thus, as there is a validly pled claim for False Arrest, the Motion to Dismiss should be denied, in whole, as to the False Arrest claim.

There was also no probable cause after the formal arrest or after the narcotics were found. To be guilty of possession, a person must have actual or constructive possession (knowingly had the power and intent to exercise control) of the narcotics. There was no actual possession as the

2

narcotics were found in a hidden compartment in the closet of a room that belonged to a former tenant. There was no constructive possession as Guzman did not know about the narcotics (see Exhibit C). Thus, it cannot be said he had the intent to exercise control over the narcotics. Mere proximity or location in the same room as the narcotics is insufficient to establish constructive possession. This is especially true as Guzman was "just renting a room in that apartment" and as his name was not on the lease, which he told the officers. See infra Section II.C.3.

The only thing that tied Guzman to the narcotics was his signing of the statement, written by officer Robles, that the narcotics were his. However, this "statement" was only obtained after he was imprisoned for three hours and subjected to coercion and threats against him and his family. No reasonable officer could believe that such a statement, taken under such extreme duress and coercion, was credible enough to give probable cause. See id.

Plaintiff's Second Amended Complaint properly pled malicious prosecution (Exhibit A, ¶¶217-243), alleging that the defendants "initiated and continued proceedings with actual malice and conscious awareness of the lack of probable cause," which malice can be demonstrated by the absence of probable cause, which was also pled. See infra Section III. Plaintiff also properly alleged that the action terminated in his favor, as although a termination in the "interests of justice" is by itself insufficient, the circumstances in this case showed that the termination was in Guzman's favor as there was absolutely no evidence with which to proceed against him, and had the case went to trial, it would have ended in acquittal. As such, the four elements of malicious prosecution were properly pled, and the Defendants' Motions should be denied. See id.

Plaintiff properly pled violations of his constitutional rights (paragraphs 244-539, Exhibit A), including allegations that the defendants violated his *Miranda* rights and continued to coerce him even after he asserted his *Miranda* rights (there can be a valid *Miranda* claim when there is

3

coercion), and allegations that the defendants conducted an illegal search and seizure of him and his property without probable cause (which claim the Federal Defendants do not include in their Motion to Dismiss – see Federal Defendants' Memorandum, p. 16). See infra Section IV. Therefore, the motions to dismiss the constitutional claims should be denied.

Plaintiff also validly pled a claim against the City under State law, through *Respondeat Superior*, and under §1983, through *Monell* liability. See infra Section V.  Although the individual defendants were deputized federal officers, and although 5 U.S.C. §3374 says that such officers are federal employees under the Federal Tort Claims Act, it does not state that they are deemed as such for state law, or that they cannot simultaneously be state employees. Under New York Law, when an employee is acting to further his employer's interest, he is acting in the scope of employment, making his employer liable for his conduct. See infra Section V.A. Here, the officers, acting as part of a DEA Joint Task Force that aimed to stop home invasions, were acting in their employers' interest in curtailing and stopping crime, and thus, were acting in the scope of employment so as to make the City liable for NYPD officers Clancy and Roy. See id.

Plaintiff sufficiently pled *Monell* Municipal liability under §1983.  See infra Section V.B. In paragraphs 490-498 (Exhibit A), Plaintiff alleged the existence of policies and practices of the NYPD, and in paragraphs 502-504, pled how such policies and practices caused and encouraged the alleged unconstitutional and unlawful conduct.  The Plaintiff should not be required to plead, in the complaint, an exact quote of the policy or allege other examples of the informal policy being carried out (such requirement to prove the existence of the policy and its link to the unlawful behavior should be in a summary judgment motion following discovery, as such items are evidence), as this would make pleading *Monell* liability in a complaint nearly impossible, and as the Plaintiff does not need to prove his claim in the Complaint, just allege it so it is plausible.

Therefore, as Plaintiff has properly pled sufficient factual allegations for and has shown evidence supporting the elements of the claims of false arrest/imprisonment, malicious prosecution, and constitutional violations, the Defendants' motions should be denied.

## EXHIBITS

Plaintiff submits the following: (1) a Declaration attaching exhibits: Exhibit A – Second Amended Complaint; Exhibit B – Affidavit of Victor Guzman; Exhibit C – Transcript from Motion to Suppress Hearing ("Suppress Transcript"); Exhibit D – Transcript from hearing held pursuant to N.Y. GML §50-H ("50-H Transcript"); Exhibit E - U.S. v. Guzman, 724 F. Supp. 2d 434 (S.D.N.Y. 2010); and (2) this Memorandum of Law. So as not to burden the Court with exhibits that are duplicative of those already submitted, the Plaintiff will refer to the Defendants' exhibits that were annexed to the their Declarations where applicable.

## STATEMENT OF FACTS[1]

On April 29, 2009, seven officers on the T32 New York Drug Enforcement Task Force, including State Police Investigator Jason Robles ("Robles"), New York City Police Department ("NYPD") Sergeant Cornelius P. Clancy ("Clancy"), DEA Special Agent Michael Reverendo ("Reverendo"), State Police Investigator Michael Bryant ("Bryant"), NYPD Detective Kevin Roy ("Roy") and State Police Investigator Bruce Taylor ("Taylor") (together the "Individual Defendants"). See Suppress Transcript (Exhibit C), p. 3-6. T32 was a prestigious unit featuring City, State, and Federal law enforcement officers. Id. at 45. The State Police continued to monitor its officers and how many arrests and drug seizures were made by its officers. Id.

Allegedly, the Individual Defendants had information from an informant that a home invasion was going to occur at 442 West 160th Street, Apt. 1C, NY, NY (the "Subject

---

[1] The Statement of Facts is based on the Transcript from the Motion to Suppress Hearing, the Transcript from the 50-H hearing, the criminal case judicial proceedings in *United States v. Guzman* 09 CR 656 (LAK) (S.D.N.Y.), and the other exhibits attached to the Declaration of Christopher M. Nyberg.

5

Premises"). Id. at 74. On April 29, 2009, Guzman resided at the Subject Premises with his wife Jenny Peña ("Peña") and their child, and a woman named Julia, who lived in another room. Id. at 93. Robles admitted that when he asked Guzman whether the apartment was his, "he said he lived there with his wife, and son. That Mr. Campos did not live there." Id. at 14. Robles stated that when he asked Guzman if Guzman's name was on the lease, Guzman stated that "my name's not on the lease; somebody else's name is on the lease." Id. Guzman testified at his 50-H that it "was not my apartment, I was just renting a room in that apartment and there were three bedrooms . . . it was my girlfriend, the one renting the room from a man." 50-H Transcript, p. 14 (Exhibit D). Guzman said he didn't know the man's name, but the apartment was under his name. Id. Guzman said the same thing in his Statement in Support of his Motion to Suppress, dated April 2, 2010, stating that "we occupied one bedroom in an apartment that had three bedrooms." Statement, attached as *Exhibit 3 to the Declaration of the Federal Defendants*. Prior to April 29, 2009, a man named Charlie, lived in the Subject Premises for about 3-4 months, and resided in the room in which the narcotics were eventually found, also known as the "Computer Room." See Suppress Transcript (Exhibit C), p. 93, 137. Charlie had moved out of the apartment approximately 1-3 months before the incident. Id. at 101, 137. As of April 29, 2009, Guzman was an illegal "undocumented" alien. Id. at 99.

At approximately between 6:30 p.m. and 8:00 p.m. (id. at 135; Statement, attached as *Exhibit 3 to the Federal Defendants' Declaration*, ¶4), the Individual Defendants knocked on the door to the Subject Premises. See Suppress Transcript (Exhibit C), p. 51. Robles admitted that they went to the Subject Premises even though **"No" they did not have probable cause to conduct or get a warrant**, but they still went with the hope that they could search the apartment. Id. at 51. When they knocked on the door Guzman was in his room watching a baseball game.

Id. at 107.   After the officers knocked on the door, Peña's brother, Pedro Campos, gave

permission for the officers to enter the Premises to answer some questions. Id. at 135. Almost

immediately after entering the apartment, the 7 officers conducted a "security sweep" and "No"

they did not request permission from anyone in the apartment to conduct such a sweep. Id. at 55.

This included the officers opening the doors to rooms and looking inside. Id. at 96.

Guzman testified that almost immediately after entering the Subject Premises, Robles

approached him and led him to Julia's room, and that Robles "immediately started yelling at me

and saying that if I knew where the narcotics were in the apartment, I should tell, because they

were going to find them anyway. And I said to him that I didn't know about narcotics . . . he

started to yell at me. He got like kind of angry." Id. at 96.   Robles even admitted, that at the

beginning of his interrogation, Guzman responded to Robles's questions of whether there were

any firearms or narcotics in his apartment by stating "there were not." Id. at 20.  Robles testified

that Guzman stated that "he did not sell narcotics, did not deal narcotics, and that he was a

hardworking person that did construction and painting." Id.   Guzman also testified how Robles:

> **handcuffed me.** And he threw me against the bed. And he exited the room. And
> he - - he almost closed the door . . . And after five minutes, he came back with my
> girlfriend's brother. And he was forcing him like to say that I should sign the
> document where they were asking for permission to search the apartment. And I
> said to them that I couldn't sign, **that I was not the owner of the apartment**.
> And he continued yelling, the policeman. And Peter was begging to me, crying,
> that **I should sign because they were going to take us all, including her, his
> daughter.** And now I was scared and nervous and confused. And I saw myself
> forced to sign. But I said that I would be responsible for whatever was in my
> room. And I was scared. And I insisted within that I was not going to sign. **And
> he yelled at me and drew his gun and he made a gesture, like he was going to
> hit me.** And I got scared. And I said, yes, that was going to sign. And at that
> point, he took the handcuffs off me and I signed.
> Id. at 97. (*emphasis added*)

Guzman stated that he was placed in the living room and "Yes" some of the officers sat

there with him. Id. at 99.  Guzman testified how "No" the police officers did not indicate that he

7

could ask them to leave or that he had the right to say no to a search, and he testified that "No" he did not feel as if he could ask police to leave. Id. at 99-100. Before he signed the form, Guzman had told Robles they could search his bedroom. Id. at 98. The search then took about "two hours; two and a half hours." Id. at 98. Peña described the search as taking "many hours." Id. at 141. Guzman stated that he never gave police officers consent to search Charlie's old bedroom, which is the room where the narcotics were eventually found. Id. at 101.

During the long search of the apartment, Robles searched the Computer Room, formerly occupied by Charlie, and testified that "in the closet, I noticed that one of the walls had been modified. I found that a board had been joint compounded and painted over. I found seams in the board. I pried the board . . . I found that there was a hole cut in the wall" and inside he found "several bags of crack cocaine, and a scale, and a small press." Id. at 32-33. Robles admitted that they were in the apartment for "hours" before they found the narcotics. Id. at 63. Guzman testified that after the narcotics were found he was taken to the Computer Room and that:

> The Hispanic agent [Robles] made me sat there. And he sat in front of me. And he was gesturing towards the place where they found the narcotics. And I said, which narcotics? And said, there, there they are . . . And I said I know nothing about that. I didn't know there were narcotics there. So he said to me you are under arrest . . . He [Robles] said to me that he was going arrest me and my girlfriend. That they were going take us. That they were going to deport us and that our son, that our son was going to be raised by another family. Id. at 102.

At his 50-H, Guzman stated that "they were just screaming at me, they were telling me that my little son was going to be raised by another family and that I was going to be deported." 50-H Transcript (Exhibit D), p. 19. After Guzman refused to sign the documents Robles was asking him to sign, the officers went to look for Peña:

> and they also handcuffed her. And the agent was yelling to me strongly. He said that . . . he needed to find somebody responsible for those narcotics. And then he was going to take us. So they handcuffed my wife. And I was refusing to sign the document. And when I saw that they were taking her, that they had her by the

8

front door of the apartment, I got scared, and I said to him that, yes that I would sign. And then they released me. And I said to him that I would sign if he took the handcuffs of my girlfriend. And he said yes, but sign. So they gave me a document [the Miranda Form]. And I answer no to the last question, where they were putting that I was going to speak to them. And he said to me that, no, that I shouldn't mark no. I should mark yes. And, at that point, he got angry at me and he yelled at me very strongly . . . And I said I was not going to write anything. And he said to me that then he was going to take me and my wife, my girlfriend. And I said that I would sign, but I was not going to write anything. And he was yelling to me strongly . . . And he wrote that, with his own hand. And then he told me to sign if I didn't want them to also take my wife. And I was scared. Confused and scared. I signed. Suppress Transcript (Exhibit D), p. 103.

Peña testified how she was handcuffed and that they were telling Guzman to sign the paper and that "if he didn't sign, they would arrest me [Peña]". Id. at 139, 148. Robles testified how after Guzman signed the form, at approximately 10:10 p.m., he wrote the time on the form. Id. at 72; see Miranda Form, attached as *Exhibit 4 to the Federal Defendants' Declaration.* Mercurio testified that "No" Robles never told him that he questioned Guzman before the Miranda Form was signed. See Suppress Transcript, p. 85. Robles admitted that Guzman wrote "No" in response to paragraph 6 indicating whether he wished to speak to the officers, that "Yes" Guzman invoked his right not to answer questions, and that "Yes" he continued to have a dialogue in Spanish with Guzman. Id. at 40-41. Mercurio confirmed this stating that "Yes" after Guzman executed the Miranda form that he didn't want to answer questions, there was additional dialogue between Robles and Guzman. Id. at 86. Mercurio stated that "Robles told Mr. Guzman that he was going to be arrested, along with his wife, for the narcotics found in the apartment." Id. at 86. Mercurio said it was after this threat that Guzman indicated that "he changed his mind and said he wanted to answer questions or wanted to make a statement." Id. at 87.

Robles admitted that "Yes" he is familiar with prosecutors usually vetting a search to make sure the facts support the search before a decision is made to go forward with this case, and it is not clear if that was ever done. Id. at 71.

9

On April 30, 2010, a Criminal Complaint was filed by Mercurio with the Southern District of New York. See Criminal Complaint, attached as *Exhibit 5 to the Federal Defendants' Declaration*. On June 26, 2010, an Information was filed. See Information attached as *Exhibit 8 to the Federal Defendants' Declaration*. On June 26, 2010, it appears that an indictment hearing was held, with Guzman filing a Waiver of Indictment on the same date. See Docket Report for Criminal case, Entry #10, attached as *Exhibit 6 to the Federal Defendants' Declaration*.

On April 23, 2010, Guzman, through his attorney, filed a Motion to Suppress (See id. at Entry #37-38), and a hearing was held before the Honorable Lewis A. Kaplan on June 24, 2010. See Suppress Transcript (Exhibit D), p.1. On November 1, 2010, a Nolle Prosequi was sent to Judge Kaplan's Chambers, and was filed with the Southern District of New York on November 2, 2010. See Nolle Prosequi, attached as *Exhibit 10 to the Federal Defendants' Declaration*. Victor Guzman was finally released from prison on November 4, 2010.

The City's request for judicial notice of their cited facts is inappropriate, especially before discovery and depositions are complete. Even though the Plaintiff is unable to refute certain parts of the officers' testimony, such as that regarding the confidential source, it should be the jury's prerogative whether or not to believe the officers' and other witnesses' testimony.

## ARGUMENT

### I.  STANDARD FOR DISMISSAL ON A RULE 12(B)(6) MOTION TO DISMISS

On a Motion to Dismiss, the "court must view the pleadings in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party." Madonna v. United States, 878 F.2d 62, 65 (2d Cir. 1989). The court must take the "'well-pleaded material facts alleged in the complaint . . . as admitted' . . . and may not dismiss the complaint 'unless it appears beyond doubt that the plaintiff can prove no sets of facts in support of his claim that

would entitle him to relief.'" Id. (quoting Riverway Realty, Inc. v. City of Niagara Falls, 754 F.2d 49, 56 (2d Cir. 1985) and Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). "The district court should deny the motion [to dismiss] unless it appears to a certainty that a plaintiff can prove no set of facts entitling him to relief." Grandon v. Merrill Lynch, 147 F.3d 184, 188 (2d Cir. 1998).

As the Supreme Court stated "we do not require heightened pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007). A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant that the defendant is liable for the misconduct alleged;" however, this is **not akin to a "probability requirement."** (*emphasis added*). Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The plaintiff must just nudge his claims across the line from conceivable to plausible. Id. at 680.

Normally, the only thing considered in a Motion to Dismiss is the complaint, and whether it states a plausible claim for relief; however, the courts can consider other material in rare cases. The Second Circuit stated that "consideration of extraneous material in judging the sufficiency of a complaint is at odds with the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), which requires only that the complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Chambers v. Time Warner, Inc., 282 F.3d 147, 154 (2d Cir. 2002). "[W]hen a district court considers certain extra-pleading materials and excludes others, it risks depriving the parties of a fair adjudication of the claims by examining an incomplete record." Id. at 155. The main documents the Defendants seek to introduce is Judge Kaplan's decision, cited as United States v. Guzman, 724 F. Supp. 2d 434, 445-46 (S.D.N.Y. 2010) ("Judge Kaplan's Decision") (attached as Exhibit E), DEA deputization documents, and other documents. While Plaintiff agrees with much of Judge Kaplan's Decision, which decision

11

lays out the constitutional violations committed by the Defendants, it is inappropriate for a motion to dismiss to be made solely on the basis of such a decision or other court documents, especially when this case involves numerous factual and credibility considerations, when only four out of 10 adult witnesses present during the subject incident testified at the motion hearing, and where Judge Kaplan made numerous credibility findings, which would normally be the jury's function at trial.

Therefore, in the case the Defendants' Motions to Dismiss should be decided on the pleadings alone. However, out of an abundance of caution, the Plaintiff attaches numerous documents including the transcripts from the Suppress hearing and 50-H hearing.

Plaintiff's Second Amended Complaint (Exhibit A) contains detailed factual allegations in paragraphs 46-154, and further allegations within each cause of action, which allege how the facts of the case fit within all of the elements of each cause of action. These factual allegations are sufficient to state a plausible claim to relief and are sufficient to allow the court to draw the reasonable inference that the defendants are liable. See Ashcroft v. Iqbal, 556 U.S. at 678.

## II. THE PLAINTIFF HAS PROPERLY PLED HIS CLAIMS OF FALSE ARREST/IMPRISONMENT AGAINST THE DEFENDANTS

Under the Federal Tort Claims Act, New York law applies, as the events giving rise to Plaintiffs' claims took place in New York. See Maldonado v. Pharo, 940 F. Supp. 51, 53-54 (S.D.N.Y. 1996). The elements for false imprisonment and false arrest claims, which overlap (together "False Arrest") are: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994). In False Arrest "every confinement of the person is an imprisonment, whether it be in a common prison or in a private house . . . or even by forcibly detaining one in public streets,

and when a man is lawfully in a house, it is imprisonment to prevent him from leaving the room." Wallace v. Kato, 549 U.S. 384, 388 (2007); see Jenkins v. City of New York, 478 F.3d 76, 88 (2d Cir. 2007) (stating that "false arrest or imprisonment derived from law of action of trespass that protects personal interest of freedom from restraint of movement"); Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (stating that "a plaintiff claiming false arrest must show . . . that the defendant intentionally confined him without his consent and without justification").

### A. Plaintiff Has Properly Pled the First Element of False Arrest

The Plaintiff has properly pled the first three elements of False Arrest, a fact which the Defendants do not challenge. In the Second Amended Complaint, Plaintiff pled in paragraph 54 that "defendant ROBLES intentionally detained and restrained the movement of" Guzman, in paragraph 55 "defendant ROBLES intentionally restricted the movement of plaintiff VICTOR GUZMAN . . . to specific locations within the Subject Premises", and in paragraph 92 that "defendant ROBLES intentionally restricted the movement of . . . GUZMAN and prevented him from leaving." See Exhibit A. Plaintiff also pled similar allegations against the other Individual Defendants in paragraphs 56-67 and 93-98. In paragraph 99 (100-105 for the other defendants), plaintiff alleged that "ROBLES confined and restricted the movement of plaintiff VICTOR GUZMAN for approximately three hours prior to formally arresting plaintiff." This is in addition to the allegations listed in the cause of action for false arrest in paragraphs 155-216. See id.

The validity of the allegations that Guzman was in custody, under arrest (even if not formally), and imprisoned in his residence is clearly laid out in Judge Kaplan's decision:

> In all the circumstances, **a reasonable person in Guzman's position would not have felt free to leave.** Seven law enforcement agents, at least one displaying a firearm, searched his small apartment for two to three hours. During most of that period, Guzman was confined to the living room. At least one officer watched over him, Peña and Campos at all times. He was not told that he was free to leave the apartment. At Investigator Robles's request, Guzman was brought to the

computer room for interrogation. The apartment's atmosphere also was hostile. Robles repeatedly threatened to arrest and deport Guzman and his girlfriend Peña. He threatened also to separate them from their child.

**The conclusion that a reasonable person in Guzman's position would not have felt free to leave is further supported by his immigration status. Guzman is an undocumented alien.** A reasonable person in his position would have known that he or she is subject to deportation and would not have felt free to walk away from the police or to ask them to leave the apartment.

**These facts indicate also that Guzman was restrained to a degree associated with formal arrest.** Significantly, the agents moved Guzman from the living room to the computer room at Robles's direction, sat him in a specific chair identified by Robles, and faced him in a specific direction for the interrogation. These actions **demonstrate an ability to control Guzman's movement akin to** that that the officers would have had had he been placed under **formal arrest**. Guzman, 724 F. Supp. 2d at 445-46 (*emphasis added*).

Guzman's and Peña's testimony shows how Guzman was led from room to room, how his movement was restricted and controlled, and how he did not feel free to leave or free to ask the officers to leave. See Suppress Transcript, p. 96-100. This demonstrates how Guzman was intentionally confined, imprisoned, and arrested in both the two-three hours period before his formal arrest and in the period following his formal arrest. See Jenkins, 478 F.3d at 88.

## B. *Plaintiff Has Properly Pled the Second and Third Elements of False Arrest*

Plaintiff also properly pled the second and third elements of False Arrest. In paragraphs 209-210, Plaintiff alleged that "on or about April 29, 2009, and for a lengthy time thereafter, Plaintiff . . . was aware of his false confinement, restriction of movement, arrest and imprisonment" for both the "approximately three hours before he was formally arrested" and "after he was formally arrested." See Exhibit A. In paragraphs 211-212 Plaintiff alleged that he "did not consent to his confinement" for the same two periods of time. See id. Guzman's testimony at his hearing makes it clear that he knew about the confinement and that he did not consent. See Suppress Transcript p. 92-112 (saying how he was scared, felt forced to sign the

14

consent to search, and did not feel free to leave or ask the police to leave, among other things).

### C. *Plaintiff Has Properly Pled and Shown the Fourth Element of False Arrest that it was not "Otherwise Privileged" as There Was No Probable Cause and as the Plaintiff Did Not Own, Know About, or Possess the Narcotics Found in the Subject Premises*

#### 1. *Plaintiff Has Properly Pled That the False Arrest of Guzman Was Not "Otherwise Privileged"*

Plaintiff has properly pled the fourth element, that the confinement was not "otherwise privileged." The existence of privilege or justification for an arrest "may be established by showing that the arrest was based on probable cause;" however "**the defendants bear the burden of proving that probable cause existed** for the plaintiff's arrest." Savino v. City of New York, 331 F.3d 63, 76 (2d Cir. 2003) (*emphasis added*); Holland v. City of Poughkeepsie, 90 A.D.3d 841, 845 (2d Dep't 2011) (stating that "[w]here the arrest is made without a warrant, 'a presumption arises that it was unlawful, and the burden of proving that the arrest was otherwise privileged is cast upon the defendant'") (quoting Tsachalis v. City of Mount Vernon, 293 A.D.2d 525, 525 (2d Dep't 2002)).  In addition, "the existence or absence of probable cause is a question of fact" usually decided by a jury. Holland, 90 A.D.3d at 845.

Probable cause exists when an officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Id. (quoting Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000)). Here, there was no probable cause that Guzman possessed the narcotics he was accused of possessing, and no probable cause to arrest Guzman, a claim which was pled in paragraphs 173-208, which stated that Robles and the other defendants had "falsely confined and imprisoned" Guzman "without probable cause that he had committed a crime" for both the three hour period prior to formal arrest and the time following Guzman's formal arrest. See Exhibit A. Moreover, Guzman cannot be said to possess such narcotics when **did he not own, know about,**

15

**or have the ability to maintain dominion or control over them.** See Affidavit (Exhibit B), ¶ 3 ("I did not own the narcotics found in the Subject Premises, nor did I have any knowledge regarding the existence of such narcotics or that such narcotics were located in the Subject Premises"). This claim was also specifically pled in paragraphs 147-148. See Exhibit A.

The above allegations as to the absence of probable cause are sufficient, by themselves, to survive a Motion to Dismiss, as they make it plausible that the Defendants lacked probable cause especially since the court must draw all favorable inferences in favor of the Plaintiff, and as the burden is on the defendants to prove probable cause. See Madonna, 878 F.2d at 65; Savino, 331 F.3d at 76. However, out of an abundance of caution, Plaintiff shows below how there was no probable cause, and that there is at minimum an issue of fact on this issue.

> 2. *There Was No Probable Cause for Victor Guzman's Arrest/Imprisonment in the Three Hours Before His Formal Arrest*

From the moment the Defendants approached and knocked on the door to the Subject Premises, they had absolutely no probable cause that Guzman had committed a crime or possessed narcotics. See Suppress Transcript, p. 51 (Exhibit C) (Robles admitting he had no probable cause). However, even without a shred of probable cause, the Defendants continued in an unconstitutional, inappropriate, and unjustified manner, conducting illegal searches, threatening and coercing Guzman and his family, intentionally distressing and harassing Guzman and his family, and stomping on Guzman's constitutional rights. See Guzman, 724 F. Supp. 2d 34 (highlighting the unconstitutional actions of the Defendants). Without probable cause, the defendants intentionally restrained the movement of Guzman, and effectively arrested him and placed him into custody so they could coerce and force him into consenting to a search. See infra Section II.A. (showing how the Plaintiff was confined and imprisoned in his own apartment). Guzman further reiterates this in his Affidavit:

16

[A]fter the officers entered the Subject Premises on April 29, 2009, at no time did feel I was free to leave, and I felt restrained in my movement by the police. I felt I could not leave the Subject Premises or any room within the Subject Premises without a police officer's permission or direction to do so. I felt like a prisoner in the place I was residing. See Affidavit (Exhibit B), ¶4.

Plaintiff pled that he was falsely arrested and imprisoned, without probable cause, during both the time periods before and after his formal arrest, as both allow for recovery. Courts in the Second Circuit have held that recovery is allowed for even short periods of confinement. See Raysor v. Port Authority, 768 F.2d 34, 39 (2d Cir. 1985) (stating that confinement by itself is enough for nominal damages and that cases uphold awards for short periods of confinement even without proof of actual damages); Gonzalez v. City of Schenectady, 2001 WL 1217224 at *5 (N.D.N.Y. 2001) (holding that plaintiff asserted a valid false arrest claim for the period of time between initial contact with police and the point where marijuana was discovered).

Plaintiff alleges that the Defendants' False Arrest, illegal search and seizure, coercion and threats, and violation of his *Miranda Rights* during the two-three hour period justifies not just nominal damages, but also money damages for the injuries caused by the Defendants' unconstitutional and illegal conduct, including emotional distress, post-traumatic stress disorder, depression. See Second Amended Complaint ¶216 (Exhibit A). If Plaintiff shows, at trial, that such injuries were caused by the violations of the Defendants, Plaintiff can recover for such injuries. See Hayes v. Perotta, 751 F. Supp. 2d 597, 605 (S.D.N.Y. 2010) (holding that to the extent injuries were linked to the unlawful search, including those for damage to Plaintiff's property, mental health, and interpersonal relationships, such claims were not barred even if there was no claim after the arrest). Importantly, the Federal Defendants acknowledge that the claim for False Arrest for this period "may require factual development", and that as such "it is not part of the instant motion," and as such, the claim for the False Arrest before the narcotics

17

were found should be upheld.  See Federal Defendants' Memorandum, p. 15.  The existence of a

claim for this period, alone warrants denial of the Motion to Dismiss the False Arrest Claim.

> 3.  *There Was No Probable Cause for Victor Guzman's Arrest/Imprisonment in the Three Hours Before His Formal Arrest*

Even after the narcotics were found in the Subject Premises, there was still no probable

cause to believe that Guzman possessed such narcotics or probable cause to arrest him.  For a

person to be guilty of possession of narcotics it must be shown that such person had either actual

or constructive possession.  See U.S. v. Gordils, 982 F.2d 64, 71 (2d Cir. 1992).  Here, as the

narcotics were found in a hidden compartment in the closet of the computer room, it is clear that

Guzman did not have actual possession.  See Suppress Transcript, p. 32-33 (Robles describing

where he found the narcotics); Guzman, 724 F. Supp. 2d at 439 ("eventually, Robles found a

hidden compartment inside the closet in the computer room" which contained the narcotics).

"Constructive possession" exists when a person . . . knowingly has the power and the

intention at a given time to exercise dominion and control over an object." Gordils, 982 F.2d at

71 (quoting U.S. v. Pelusio, 725 F.2d 161, 167 (2d Cir. 1983). "Mere proximity or presence" is

insufficient to support a finding of constructive possession.  U.S. v. Rodriguez, 392 F.3d 539,

548 (2d Cir. 2004).  In this case, Guzman did not own, possess, or have any knowledge regarding

the narcotics that were found in the Subject Premises, as shown by his Affidavit:

> [T]he drugs that were found . . . did not belong to me. Before I was informed
> about the drugs . . . I did not know about and had no knowledge that there were
> narcotics located in the Subject Premises.  I do not know who the drugs belong to
> as I did not even know those drugs existed prior to being informed of their
> existence by the police. Affidavit of Victor Guzman, attached as Exhibit B, ¶3.

As Guzman had no knowledge regarding the narcotics, it cannot be said that he had the

intent to exercise control over them, which is required for constructive possession.  The mere

fact that the narcotics were found in the Subject Premises is insufficient to find probable cause

that he constructively possessed them, or to justify his arrest, as such narcotics were not found in plain view, but in a hidden compartment. See Rodriguez, 392 F.3d at 548 (holding that there was insufficient evidence for a jury to conclude that the defendant constructively possessed the heroin because even if the defendant was in the back seat of the car next to the box of narcotics, it would only establish his proximity to the box, which was not sufficient to show constructive possession); U.S. v. Samaria, 239 F.3d 228, 239 (2d Cir. 2001) (finding that there was insufficient evidence to find that the defendant exercised control over the box of stolen goods as there was no evidence he handled the boxes or knew its contents) (*overturned on other grounds*).

Importantly, Guzman did not own the Subject Premises, nor was his name on the lease; instead, it was his girlfriend who was "just renting a room in that apartment" for her, Guzman, and their son. See 50-H Transcript (Exhibit D), p. 14. Robles admitted that when he asked Guzman whether the apartment was his, Guzman told him that "my name's not on the lease; somebody else's name is on the lease." See Suppress Transcript (Exhibit C), p. 14. Moreover, the lack of probable cause is further shown by the fact that the room where the narcotics were found was the former room of a man named Charlie, who had resided in the Computer Room for approximately 3-4 months, and that Guzman did not reside in the Computer Room. See id.

The only thing that tied Guzman to the narcotics found in the Subject Premises was his signature of the statement (in Spanish) that "I am the owner of the drugs found in the apartment," which was written by Robles. See Miranda Form, attached as *Exhibit 4 to the Federal Defendants' Memorandum*; Suppress Transcript, p. 103 (indicating Robles wrote the statement). However, this "signed statement" was only obtained after severe coercion and numerous threats were applied to Guzman, including yelling at Guzman, threats of violence, handcuffing Guzman and Peña, threats to deport Guzman and Peña, threats to arrest everyone, imprisonment within

19

the apartment for several hours, and threats to take away his children.  See Second Amended

Complaint ¶229; Suppress Transcript p. 97-98, 102-103, 139, 148; Guzman, 724 F. Supp.2d at

445-56.  No reasonable police officer could believe that such a statement, taken under such

extreme duress and coercion, was credible enough to provide probable cause that Guzman

possessed the narcotics or to provide enough probable cause to arrest Guzman.

At a minimum, there is an issue of fact as to whether a reasonable police officer would

believe that there was probable cause that Guzman constructively possessed the narcotics or that

there was probable cause to arrest him, which issue of fact warrants the denial of a Motion for

Summary Judgment.  See Stern v. Trustees of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997)

(stating that in a motion for summary judgment "the court is required to resolve all ambiguities

and draw all permissible factual inferences in favor of the" non-movant).  This is especially true,

as probable cause is usually an issue of fact for a jury to decide.  See Holland, 90 A.D.3d at 845.

However, as this is a Motion to Dismiss, the only question is whether Plaintiff properly pled the

element that the arrest was "not otherwise privileged," which the Plaintiff has properly done in

his Second Amended Complaint.  See Exhibit A, ¶¶173-208.

### III. THE PLAINTIFF HAS PROPERLY PLED HIS MALICIOUS PROSECUTION CLAIMS AGAINST THE DEFENDANTS

New York law also applies under the Federal Tort Claims Act to the Plaintiff's malicious

prosecution claim.  The elements of malicious prosecution are: "(1) the initiation or continuation

of a criminal proceeding against the plaintiff; (2) termination of the proceeding in plaintiff's

favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as

motivation for defendant's actions." Jocks v. Tavernier, 316 F.3d 128, 136 (2d Cir. 2003).

#### A.  Plaintiff Properly Pled That the Defendants Had Actual Malice

Malice is an element regarding the defendant's state of mind, and thus, the complaint,

which alleges that the defendants "initiated and continued the proceedings with actual malice and with conscious awareness of the lack of probable cause", is sufficient to plead the element of malice. See Second Amended Complaint ¶¶234-242. This allegation makes the malice element plausible on its face, especially as Plaintiff's complaint is not subject to a "heightened pleading of specifics," and as Plaintiff is entitled to every favorable inference. Twombly, 550 U.S. at 570. The Plaintiff is not and should not be required to plead the exact thought process and reason for the defendant's malice, especially prior to the ability to depose the defendants.

Malice is defined as performing an act with awareness of "conscious falsity," or initiating or continuing proceedings while knowing there is no probable cause. See Lowth v. Town of Cheektowaga, 82 F.3d 563, 572 (2d Cir. 1996) (stating that malice "does not connote actual spite or hatred, but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served'") (citing Nardelli v. Stamberg, 44 N.Y.2d 500, 502-03 (1978)); Brogdon v. City of New Rochelle, 200 F. Supp. 2d 411, 423 (S.D.N.Y. 2002) (stating that "there must be a showing of some deliberate act punctuated with awareness of 'conscious falsity' to establish malice"). **Malice can be shown by the lack of probable cause,** which "tends to show that the accuser did not believe in the guilt of the accused, **and malice may be inferred**" (*emphasis added*) from such a lacking of probable cause. Lowth, 82 F.3d at 573 (quoting Conkey v. State, 74 A.D.2d 998, 999, (4th Dep't 1980)). The City argues that Plaintiff's allegations of actual malice are insufficient because he did not plead facts showing "personal animus." However, "personal animus" is not required to show malice, but rather it is just one way in which Plaintiff can prove malice.

In this case, the lack of probable cause (discussed supra Section II), is evidence that there was actual malice as it shows the Defendants did not believe in the guilt of the accused and that

they had something other than a desire to see justice served in commencing proceedings. This is especially true when combined with the allegations that the Defendants "initiated and continued proceedings" with knowledge of the "illegal search and seizure . . . the coercion, intimidation, and threats made against the Plaintiff," and that they "induced the United States Attorney to commence and continue legal proceedings" by omitting such material facts. See Second Amended Complaint, ¶¶ 220-228. It is not just that the Individual Defendants did not tell the prosecutors that it was an "illegal search" but rather they did not reveal and/or concealed how Guzman's "statement" was obtained using threats, coercion, and a prior 2-3 hour illegal imprisonment, and this is especially true as it is not clear prosecutors vetted the case to make sure the facts supported the search before a decision was made. See Suppress Transcript, p. 71. The fact that the Federal Prosecutors later fought the Motion to Suppress does not negate any inducement to the prosecution. Moreover, without further discovery, particularly depositions, Plaintiff cannot know whether there was any "personal animus." Therefore, as Plaintiff has successfully pled malice, the Defendants' Motions to Dismiss should be denied.

## B. *Plaintiff Properly Pled Termination in the Plaintiff's Favor*

It is true that "a cause of action for malicious prosecution may not be maintained where the prosecution of plaintiff was not terminated in his favor." Hygh v. Jacobs, 961 F.2d 359, 367 (2d Cir. 1992). "Where the prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused . . . only when its final disposition is such as to indicate the innocence of the accused." Murphy v. Lynn, 118 F.3d 938, 948 (2d Cir. 1997). Defendants try to claim that a "Nolle Prosequi" can never show termination in favor of the accused; however, this is inaccurate.

While the 2nd Circuit did hold that a dismissal based on the "interest of justice" cannot, as a matter of law, provide the favorable termination required for malicious prosecution, this **does**

22

not mean that a termination ending in the "interests of justice" can never show termination in favor of the accused, just that such a termination is not enough by itself. See Hygh, 961 F.22 at 368. The reason for this is that "a dismissal 'in the interests of justice' is neither an acquittal of the charges nor a determination on the merits, as it leaves the question of guilt or innocence unanswered." Ryan v. N.Y. Tel. Co., 62 N.Y.2d 494, 504 (1984).

The key is whether a complaint alleges that the criminal action terminated in plaintiff's favor or showed his innocence. See Hankins v. Great Atl. & Pac. Tea Co., 208 A.D.2d 111, 116 (1st Dep't 1995) (stating that absolute preclusion of malicious prosecution following a dismissal in the interest of justice is not appropriate); Coakley v. Jaffe, 49 F. Supp. 2d 615, 621 (S.D.N.Y. 1999) (dismissal in the interests of justice is not a favorable termination unless the circumstances surrounding the dismissal are indicative of innocence). In Hankins, the Court stated:

> [Ryan v. N.Y. Tel.] does not appear to have established that, as a matter of law, a dismissal in the interest of justice bars a subsequent claim for malicious prosecution . . . such an interpretation would lead to an illogical and manifestly unfair result . . . [that] the only people who could succeed on a claim for malicious prosecution would be those who, because the arrest was questionable, would proceed to trial . . . while those whose arrests were truly and obviously invalid, would have the matter disposed of ipso facto and without litigation. Hankins, 208 A.D.2d at 114.

Here, Plaintiff properly alleged such favorable termination:

> The proceedings against VICTOR GUZMAN terminated favorably to Plaintiff, as the UNITED STATES OF AMERICA was unable to proceed against VICTOR GUZMAN as there was absolutely no admissible evidence against VICTOR GUZMAN that could have convicted plaintiff VICTOR GUZMAN, and had the case proceeded to trial, VICTOR GUZMAN would have been acquitted. See Second Amended Complaint ¶232 (Exhibit A)

There are few terminations that are more "favorable to the accused" than a termination, which is made because there is no evidence on which to proceed, and because had the case been tried it would have undoubtedly ended in acquittal. Following Judge Kaplan's decision

suppressing Guzman's "statements" and the items found in the Subject Premises, there was no admissible evidence that showed Guzman had committed any crime, and as stated earlier, even without Judge Kaplan's decision, the only evidence showing constructive possession was an unreliable "statement" taken under duress and coercion. Guzman, 724 F. Supp. 2d at 443, 446-47. Thus, Plaintiffs have successfully pled and demonstrated this element.

### C. Plaintiff Properly Pled the Lack of Probable Cause For the Prosecution of Guzman

The lack of probable cause for Guzman's arrest (see supra Section II) continued from the time of his arrest, through the commencement of criminal proceedings at his arrangement, and continued until the final dismissal of the proceedings on November 1, 2010. See Second Amended Complaint ¶¶234-242. Plaintiff concedes that the claims against the Assistant United States Attorneys for malicious prosecution are barred by sovereign immunity.

### IV. THE PLAINTIFF HAS PROPERLY PLED VIOLATIONS OF HIS CONSTITUTIONAL RIGHTS INCLUDING ILLEGAL SEARCH AND SEIZURE AND VIOLATIONS OF *MIRANDA* UNDER §1983/BIVENS V. SIX UNKNOWN

In addition, to the factual allegations in paragraphs 46-154, Plaintiff alleged additional facts and violations of the Plaintiff's Constitutional rights under §1983/*Bivens v. Six Unknown Named Agents* in paragraphs 234-539, including separate causes of action for illegal search and seizure and violation of Plaintiff's *Miranda* rights. See Second Amended Complaint (Exhibit A).

Plaintiff has a valid cause of action for the violation of his *Miranda* rights because although "*Miranda* violations, **absent coercion**, do not rise to the level of constitutional violations actionable under §1983" (*emphasis added*), **there was coercion in this case**. Jocks, 316 F.3d at 138. Plaintiff alleged that after he invoked his *Miranda* rights, Robles and Mercurio continued to try to obtain incriminating statements by making threats to deport the Plaintiff, arrest everyone, and take away his children, handcuffing Peña, and applying other intimidation.

24

See Second Amended Complaint ¶¶531-38; <u>Guzman</u>, 724 F. Supp. 2d at 443-46 (confirming the coercion). As Plaintiff alleged coercion, he has a valid claim for the damages caused by such coercion and the violation of his *Miranda* rights, including emotional distress and his injuries.

Similarly, a valid claim can be made for an illegal search and seizure, to the extent such search and seizure caused the Plaintiff's damages. See <u>Hayes,</u> 751 F. Supp. 2d at 604-05; <u>McDermott v. City of New York,</u> 2002 WL 265127 (S.D.N.Y. 2002) (holding that there was still a claim for the illegal search and seizure even where there was probable cause after the search); <u>Brandon v. City of New York</u>, 705 F. Supp. 2d 261, 271 (S.D.N.Y. 2010) (holding that a person may bring an action under state law or §1983 based on unreasonable search and seizure). This is especially true when the seizure takes place in a plaintiff's residence, in which searches and seizures without a warrant are presumptively unreasonable. See <u>Loria v. Gorman</u>, 306 F.3d 1271, 1286 (2d Cir. 2000). Here, Plaintiff alleged in paragraph 539 of the Second Amended Complaint, that the illegal search and seizure caused him various injuries. See <u>Exhibit A</u>.

Notably, the Federal Defendants have not included the illegal search and seizure violation in their motion to dismiss. As the Plaintiff has stated a valid claim for violations of the Plaintiff's constitutional rights, including illegal search and seizure, false arrest and false imprisonment, and violation of his *Miranda* rights, the Defendants' Motions to Dismiss should be denied.

## V. <u>PLAINTIFF HAS PLED A VALID CLAIM FOR MUNCIPAL LIABILITY AGAINST THE CITY OF NEW YORK UNDER STATE LAW AND UNDER §1983/*MONELL* MUNICIPAL LIABILITY</u>

The City is liable under: 1) state law under respondeat superior for the actions of its officers, Clancy and Roy, and 2) municipal liability under §1983 due to its policies and procedures.

### A.   *The City is Liable Under State Law Through Respondeat Superior*

All the Defendants submit that the 7 individual defendants were deputized as DEA Task

25

Force Officers at the time of incident, and, as such, they are deemed federal employees under 21 U.S.C. §878(b) and 5 U.S.C. §3374(c). However, while §3374(c) states that such persons are "deemed an employee of the agency for purpose of chapter 73 of this title . . . the Federal Tort Claims Act and any other Federal tort liability statute", **it does not say they are deemed federal employees under state law or that it preempts state law**, nor does it state that persons cannot simultaneously be state and federal employees. Even if the individual defendants are considered federal employees under §1983, it does not mean that the City cannot also be liable for the False Arrest committed by its employees, under New York law, by virtue of Respondeat Superior.

In New York, an employer is liable for the acts of its employees when their acts fall within the scope of employment or when such acts are "to further the employer's interest, or to carry out duties . . . in furthering the employer's business." Beauchamp v. City of New York, 3 A.D.3d 465, 466 (2d Dep't 2004). The test for determining if an employee was within the scope of employment is "whether the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions." Riviello v. Waldon, 47 N.Y.2d 297, 302 (1979). This "depends largely on the facts and circumstances peculiar to each case," is "heavily dependent on factual considerations," and should be decided by the jury. Id. at 302-303; Beauchamp, 3 A.D.3d at 466-467 (scope of employment is a question for the jury).

In this case, Robles testified that he was part of T-32, a DEA joint task force with the NYPD and NY State Police, which was created to investigate home invasion and police impersonation cases. See Suppress Transcript, p. 3-4. Part of this task force was "group supervisor" Sergeant Clancy and Detective Kevin Roy of the NYPD. Id. at p. 5-6. Robles testified that supervisors within the State Police would monitor how many arrests and drug seizures he made, and that they would keep statistics of such. While Robles was testifying as to

the State Police and not the NYPD, it seems probable that the arrangements are similar for both, but this cannot be determined until Plaintiff is able to conduct discovery and depositions regarding the monitoring and supervision administered over their officers by the NYPD and City.

The T32 task force clearly serves the interests of the local law enforcement agencies, such as the NYPD, in curtailing crime, and Clancy's and Roy's involvement and actions within such task force are similarly within the NYPD's interest, and thus, within the scope of employment. Therefore, the City is liable under New York law, through *Respondeat Superior,* for the actions of defendants Clancy and Roy, especially as Plaintiff has pled that Clancy and Roy were employees of the City, and that they were acting in the scope of their employment during the alleged acts (see ¶¶ 20, 28, 39 of the Second Amended Complaint).

The City cites Faraq v. U.S., 587 F. Supp.2d 436 (2008) for support of their claim that the City cannot be concurrently liable under state law pursuant to *Respondeat Superior*. First, Faraq is not binding authority, and most importantly, it is not clear that the issue of whether the City could be concurrently liable under *Respondeat Superior*, due to the officers' actions being within the scope of employment, was raised in that case, as it was not discussed in the decision.

The City's claim that this would lead to a "paradoxical position" there they cannot represent their "employees" but still remain liable for their actions, is irrelevant. First, there are many situations in litigation where a party can be liable for another's actions, but where that party's attorneys cannot represent the other person, such as in a malpractice action where an employee doctor has separate insurance from the hospital, or where a former employee has separate counsel, and others, despite the fact that the employer/hospital may still be liable for the employee's actions. This court should not add an additional element to *Respondeat Superior* that the Plaintiff must show that the employee and employer must be able to be represented by the

same attorney for there to be liability, as such an element would be nonsensical and unfair.

Therefore, as the Plaintiff has successfully alleged that the City is liable, under *Respondeat Superior*, for the acts of Clancy and Roy, the motion to dismiss should be denied.

### B.    The City is Liable Under §1983 Pursuant to Monell Municipal Liability

It is true that a municipality cannot be liable under §1983 on the theory of *Respondeat Superior*, but only on the basis that its policies or customs "inflicted the injury upon the plaintiff." Brandon, 705 F. Supp. 2d at 276; Monell v. Dep't of Social Servs., 436 U.S. 658 (1978). "To hold a city liable under §1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Id. (quoting Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983)).  A plaintiff can meet the "official policy or custom" requirement by pleading (in a Motion to Dismiss) and proving (at trial) that:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policymaker must have been aware; or (4) failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.
> Bowen v. City of New York, 2010 WL 5122590 at *3 (S.D.N.Y. 2010).

In this case, the Plaintiff has alleged the existence of such customs, policies, and practices (the "Policies") in paragraphs 490-498 of the Second Amended Complaint. For the sake of brevity, only the language of paragraph 494 is included herein:

> The actions of the individual defendants, including CLANCY and ROY, resulted from and were taken pursuant to the following de facto policies and/or well-settled and widespread customs, policies, and practices of THE CITY OF NEW YORK, which were and are implemented by members of its police department:
>
> a.        Members of the New York City Police Department are encouraged and/or allowed by their supervisors to use coercive and intimidating interrogation techniques, including threatening

28

arrest and deportation of the suspects and family members – i.e., without fear of reprimand, discipline, or even re-training by the New York City Police Department.

b.       Members of the New York City Police Department are encouraged and/or allowed by their supervisors to conduct illegal, intrusive, and excessive searches and seizures of civilians – i.e., without fear of reprimand, discipline, or even re-training by the New York City Police Department

c.       Members of the New York City Police Department are encouraged and/or allowed by their supervisors to apply coercive and intimidating interrogation techniques, in violation of a suspect's *Miranda* rights even after said suspect exercises his *Miranda* rights not to speak to police officers – i.e., without fear of reprimand, discipline, or even re-training by the New York City Police Department

d.       New York City Police Officers, engaged in systemic and ubiquitous perjury, both oral and written, to cover-up constitutional and state law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates. They did so and do so with the knowledge and approval of their supervisors, commanders and Police Commissioners who all:

  i. tacitly accept and encourage a code of silence wherein police officers refused to report other officers misconduct or tell false and incomplete stories designed to cover for and/or falsely exonerate accused police officers; and

  ii. encourage and/or fail to discipline officers for "testifying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil right violations perpetrated by themselves or fellow officers, supervisors and/or subordinates against those civilians; and

See Exhibit A

Plaintiff alleged that these Policies caused and encouraged the officers to engage in the unconstitutional conduct alleged in the complaint and that such conduct was a foreseeable result of such customs, practices, and policies.  See Second Amended Complaint ¶¶502-04.   The Plaintiff should not be required to plead, within the complaint, a quote of the policy or allege other examples of the informal policy being carried out (rather, proving the existence of the policy and its link to the unconstitutional behavior should be for a summary judgment motion following the completion of evidentiary discovery), as this would make pleading *Monell* liability nearly impossible.  The pleading of such policies is enough to make the claim of the existence of *Monell* liability plausible, and it is through discovery that will determine if Plaintiff will be able to prove the existence of such policies and the required causal connection to the conduct.

The City cites Oklahoma v. Tuttle, 471 U.S. 808 (1985) for the premise that a single instance of unconstitutional activity is insufficient to impose liability on the City.  However, this

29

misapplies and confuses what the Tuttle Court was saying.  Tuttle addressed the requirement for the Plaintiff to show a "causal relation" between the policy and alleged unconstitutional conduct, and said that when the claim of "policy" is simply a nebulous claim of "inadequate training," more than one instant of unconstitutional conduct is needed; they did not hold that one instance of unconstitutional conduct can never lead to *Monell* liability.  See Tuttle, 471 U.S. at 822-23. The standard, as was in *Tuttle* and *Monell*, is simply that the Plaintiff must show a causal relation between the policy and the conduct.  Tuttle is also distinguishable as it dealt with a case that had went to trial on the merits, and was not dealing with the standard of pleading.  If Plaintiff can prove, after discovery, the existence of such policies, and a causal connection between the policies and the unlawful conduct, Plaintiff would have a valid *Monell* claim, but Plaintiff's allegations in the Complaint is certainly sufficient to make such *Monell* claim a plausible one.

Therefore, as Plaintiff has alleged that the Policies foreseeably inflicted injury upon the Plaintiff by causing and encouraging the unconstitutional conduct exhibited by the officers in this case, the City's Motion to Dismiss Plaintiff's *Monell* claims should be denied.

## CONCLUSION

For the foregoing reasons, plaintiff Victor Guzman respectfully requests that this Court enter an Order denying the Defendants' Motions to Dismiss in their entirety, together with such other and further relief this Court may deem just and proper.

Dated: New York, New York
      September 1, 2012

                                  Respectfully submitted,
                                  The Jacob D. Fuchsberg Law Firm, LLP
                                  500 Fifth Avenue, 45th Floor
                                  New York, NY  10110
                                  Tel:  (212) 869-3500

By:                                _____
                                  CHRISTOPHER M. NYBERG (CN8937)
                                  c.nyberg@fuchsberg.com

30